A07A0829. CPI PHIPPS, LLC v. 100 PARK AVENUE PARTNERS, L.P.
(654 SE2d 690)

ADAMS, Judge.

The developer of luxury condominiums at Phipps Mall in Atlanta brought suit to enforce an alleged limitation on the use to which the owner of the remainder of the Phipps property could put its parcel. The limitation, found in an agreement between the parties, allegedly prohibits the owner of the mall and several other tracts from building

a 250-room hotel and two 32-story residential towers on the site. The trial court entered summary judgment upholding the use limitation, and this appeal ensued. We hold that the relevant provision of the agreement is ambiguous but that, when properly construed, the agreement contains no enforceable use limitation.

Although the primary issue in this case is a matter of contractual interpretation, the facts arose in connection with two applications for modification of the special zoning applicable to the entire Phipps Mall site. As of 1995, the 37-acre Phipps development, which consists of the mall property and several other tracts (the Phipps Land),[1] was designated under the Atlanta Zoning Ordinance as "planned development — mixed use" ("PD-MU"). PD-MU zoning is essentially custom-made by the applicant in a manner consistent with the city's comprehensive development plan, and it is subject to approval by the appropriate zoning authorities. The PD-MU designation on a large tract allows a mixture of types of use, such as residential, office, retail, hotel, and other commercial use, subject to an approved site plan, which establishes the specific buildings that will be constructed and their proposed use.

One intent of PD-MU zoning is to create "districts for specialized purposes" where tracts are suitable for development on a "unified basis." Accordingly, a planned development must involve "[l]and under unified control, to be planned and developed as a whole," and "[i]n a single development operation or a definitely programmed series of development operations, including all land and buildings." Thus, in addition to a site plan, applications for PD-MU amendments must include "[a] report identifying all property owners within the area of the proposed district giving evidence of unified control of its entire area."

The undisputed facts show that as of 1995, Equitable Life Assurance Society of the United States owned the entire Phipps Land, and the then-existing zoning site plan for the property was the "1994 Site Plan." Future development on the Phipps Land was conditioned upon compliance with that plan. At the time, Equitable was considering expanding the mall, adding some office buildings, and selling the 4.5 acre, residential sub-tract to 100 Park Avenue Partners, L.P., a company owned by John Kusmiersky, on which Kusmiersky planned to build a 123-unit condominium tower and a

---

[1] The Phipps Land consists of the following tracts: the Phipps Mall Tract (approximately 23.5 acres); Tract H (approximately 4.5 acres); Tract D (approximately 1.95 acres); Tract F (approximately 2.4 acres); and Residential Phase I and Phase II (approximately 4.5 acres).

second similar tower.[2] In 1996, to facilitate the proposed changes, Equitable filed two separate applications with the City of Atlanta to amend the 1994 Site Plan to allow the reconfigured uses, which resulted in the entire Phipps Land again being zoned PD-MU in accordance with two new site plans — one for each of the two parcels that would now be owned separately.

In an amendment pertaining to the commercial tracts, known as Z-96-69, Equitable obtained zoning expressly conditioned upon, among other things, a February 3, 1997 site plan for the commercial part of the Phipps Land, including Tract H.[3] That site plan indicated that the intended development included, among other things, a maximum of "2,100,000 square feet (1,600,000 retail and 500,000 office)." In an amendment pertaining to the residential tracts, known as Z-96-70, Equitable obtained zoning expressly conditioned upon a May 7, 1997 site plan for the condominiums, as well as certain other written conditions. That site plan indicated that development on what came to be Kusmiersky's property would include "a maximum of 420,000 square feet of development with a maximum of 130 residential units." The two applications were approved in part,[4] resulting in Atlanta Zoning Ordinances Z-96-69 and Z-96-70, and together they became the "1997 Approved Site Plan." Any future development on the Phipps Land was now conditioned upon compliance with the 1997 Site Plan.

Equitable then decided to sell the mall and most of the remaining property to CPI-Phipps, LLC, including a parcel known as sub-tract H. Negotiations ensued, and Equitable entered into two separate transactions to sell the two parcels to Kusmiersky and CPI respectively. The agreement between Equitable and Kusmiersky for the residential tract expressly restricted Kusmiersky's use of that tract to "multifamily residential uses of first class luxury quality" consistent with the existing plans, but it did not prohibit Equitable from residential use of the remainder of the property. Meanwhile, Equitable and CPI entered into separate purchase and sale agreements for the Mall tract and, later, Tracts D and H. Neither of these agreements prohibited CPI from residential use of its tracts.

---

[2] Kusmiersky and entities owned or controlled by him, including 100 Park Avenue Partners, L.P. and 300 Park Avenue Partners, L.P., will all be referred to as "Kusmiersky" in this opinion.

[3] The Atlanta Zoning Ordinance provides that when a parcel is "conditionally zoned," no building permit can be issued that is not in conformance with the conditions, and the plans may not be altered, changed or varied except after appropriate approval. Compare *Cherokee County v. Martin*, 253 Ga. App. 395, 398 (1) (559 SE2d 138) (2002) (zoning not conditioned on compliance with site plan where the zoning decision did not expressly so state).

[4] Ultimately the City approved amended versions of the original applications. The approved applications allowed only one of the two residential high-rise towers sought by Kusmiersky and only one of CPI-Phipps, LLC's requested office towers.

During negotiations for the two purchase and sale agreements, however, and partly because the parties needed to maintain "unified control" of the entire Phipps Land in order to satisfy PD-MU zoning requirements, the two buyers, Kusmiersky and CPI, negotiated the document at issue in this case, which is dated December 15, 1997 and entitled "Declaration of Easements and Agreement for Development of Phipps Land as a Planned Development-Mixed Use" (the "Declaration"). Recorded on January 9, 1998, the Declaration establishes the parties' agreement about easements necessary for future development of all Phipps tracts, as well as the parties' intentions regarding future development of the entire property.[5]

In accordance with the 1997 Site Plan, Kusmiersky developed and built the first of his two condominium towers, and he is now ready to build the second. But CPI never enlarged the mall or added office buildings in accordance with the 1997 Site Plan. Instead, approximately eight years after purchasing the property, CPI, together with another firm no longer involved in this litigation, revealed new plans for Tract H including a 250-room hotel and two 32-story residential towers containing 530 units, with the new towers located on Tract H, directly adjacent to Kusmiersky's high-rise condominium towers. CPI also filed an application to amend the PD-MU zoning to allow residential buildings on Tract H. It is not disputed that the new plans would not comply with the existing 1997 Site Plan. In response, Kusmiersky brought suit, alleging that the terms of the Declaration prohibit CPI from developing high-rise residential and hotel buildings on the site and that CPI's actions have breached the Declaration in several other ways. On cross-motions for summary judgment, the trial court enjoined CPI "from following through with the proposed Site Plan amendment." CPI appeals that decision as well as the denial of its motion for summary judgment on the same issue.[6]

"In Georgia, it is clear that two parties may contract away or extend their rights as they please regarding the use of real property so long as public policy is not violated. *Winslette v. Keeler*, 220 Ga. 100, 100-101 (1) (137 SE2d 288) (1964)." *Godley Park Homeowners Assn. v. Bowen*, 286 Ga. App. 21, 23 (c) (649 SE2d 308) (2007). Parties may do so with restrictive covenants, which are simply specialized contracts that run with the land. *Duffy v. Landings Assn.*, 245 Ga. App.

---

[5] For instance, the Declaration states that Kusmiersky would be seeking approval from the City of Atlanta for the planned second condominium tower (that had been refused by the City in the 1997 Site Plan) and that no party would oppose the request. Kusmiersky's second tower has since been approved.

[6] CPI does not argue on appeal that it is entitled to summary judgment on any of the remaining issues raised in Kusmiersky's complaint.

104 (536 SE2d 758) (2000).[7] Parties may enforce restrictive covenants that limit property use even though the use complies with current zoning. See *Davies v. Curry*, 230 Ga. 190, 192 (196 SE2d 382) (1973) (rezoning of property does not nullify restrictive covenants); cf. *Waterfront, LLP v. River Oaks Condo. Assn.*, 287 Ga. App. 442 (651 SE2d 481) (2007) (private restrictive covenant held enforceable regardless of restriction's validity under the Condominium Act).

Thus, independent of zoning considerations, we must address whether CPI is contractually prohibited from residential development on its part of the Phipps Land. The answer requires construction of the relevant provisions of the Declaration in accordance with the usual rules:

> Restrictive covenants, as contracts, are interpreted according to the rules of contract construction. Initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If so, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of [contract] construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury or other factfinder.

(Punctuation and footnotes omitted.) *Britt v. Albright*, 282 Ga. App. 206, 209 (2) (638 SE2d 372) (2006).

a. First, the Declaration itself plainly authorizes the parties to seek amendments to the "Approved Site Plan." Paragraph 3.4 of the agreement provides:

> 3.4. *Future Site Plan Amendments.*
> (a) In addition to the rights provided for in Section 3.1[, see below], an Owner may, at any time and from time to time, apply to the Planning Department for an amendment to the then existing Approved Site Plan for any of its property within the Phipps Land. . . .

"Approved Site Plan" is defined to mean "at any time, the current site plan for the Phipps Land or any portion thereof, as approved by the

---

[7] In municipalities and county areas where zoning laws have been adopted, private building and use restrictions are abrogated after 20 years unless lawfully extended. OCGA § 44-5-60; *Payne v. Borkat*, 244 Ga. 615 (261 SE2d 393) (1979).

City of Atlanta." This right to amend is subject to only four enumerated conditions, none of which provides the limitation sought by Kusmiersky.[8] The right to amend the site plan is reflected in other aspects of the Declaration.[9] Thus Paragraph 3.4 authorizes each owner of the Phipps Land to seek modification of that portion of the 1997 Site Plan applicable to its property.

Nevertheless, Kusmiersky contends, and the trial court held, that CPI's use of its property is limited by Paragraph 3.1 of the Declaration, which, it is not disputed, contains the only possible relevant restriction on CPI's future use of its tracts. Pursuant to Paragraph 3.1, the parties agreed that "any future development" of the Phipps Land must comply with (1) "an Approved Site Plan"; (2) the Zoning Ordinance; and (3) the "Zoning Conditions applicable to such property," as follows:

> 3.1 *General Compliance with Approved Site Plan, Zoning Ordinance and Zoning Conditions.* Any future development of any portion of the Phipps Land shall be undertaken only in accordance with *an Approved Site Plan* with respect to such property and all other requirements of the Zoning Ordinance *and Zoning Conditions applicable to such property*; provided however, it is acknowledged that the Owners of Residential Tract 2 intend[ ], to seek modification of the Zoning Conditions and Comprehensive Development Plan as required to permit development of the condominium tower on Residential Tract 2. . . . Each Owner agrees to consent to . . . and not to oppose changes to the zoning

---

[8] Those conditions are that the site plan amendment relate only to the petitioner's property, that the amendment state that it seeks to amend a portion of the Phipps Land as a whole, that the amendment include the then current "Approved Site Plans" for all portions of the Phipps Land, and that copies of the submission be sent to all other owners.

[9] The recitals to the Declaration provide, in part:
> It is contemplated that the several Tracts may hereafter be separately owned, and where not already developed and improved, separately developed and improved.

Paragraph 5.1 of the Declaration provides, in part:
> *Intent.* Notwithstanding anything to the contrary herein contained, this Declaration is intended to preserve the PD-MU zoning classification of the Phipps Land and to satisfy the requirement for unified control of the Phipps Land by imposing the restrictions set forth herein, *provided* that, except as herein specifically set forth, (a) each Owner shall retain full ownership and control of its respective property within the Phipps Land and (b). . . .

(Emphasis in original.) Paragraph 2.9 of the Declaration provides, in part:
> [A]ny Owner of all or any portion of the Phipps Land, shall have the right to expand, reduce, alter, modify, reconfigure, relocate or otherwise redevelop the [facilities for which easements have been created and installed or constructed] . . . on their respective property in any manner such owner shall deem reasonably necessary or appropriate in connection with the development or redevelopment of any improvements now or hereafter located on their respective properties.

conditions and comprehensive development plan as necessary to permit such development. . . .

(Emphasis supplied.)

Paragraph 3.1 is consistent with Paragraph 3.4 in that it appears to allow CPI to seek and obtain changes to the site plan for its portion of the Phipps Land. For instance, Paragraph 3.1 requires that any future development must comply with "an Approved Site Plan," which is defined to mean, "at any time, the current site plan. . . ." Paragraph 3.1 also provides that each Owner can undertake future development and seek future *rezoning* of its tract separate from the other tracts so long as the actions did not place any other tract in violation of the Zoning Ordinance:

> . . . Each Owner shall have the right to apply to the Planning Department for a determination that its Tract will be considered separately from the other Tracts in terms of its compliance with the Approved Site Plan, the Zoning Conditions and the Zoning Ordinance. No Owner shall undertake any future development or seek any future rezoning of any portion of the Phipps Land which would have the effect of placing any other Tract in violation of applicable provisions of the Zoning Ordinance.

One therefore could conclude that Paragraph 3.1, like Paragraph 3.4, authorizes CPI to amend the existing site plan, seek and obtain approval of the change from the City of Atlanta, and then develop its property accordingly.

On the other hand, Paragraph 3.1 also provides that any future development must comply with the "Zoning Conditions applicable to the property," which by definition includes the "specific conditions" set forth in the 1997 Site Plan, including, oddly, the 1997 Site Plan itself; thus, arguably, "any future development" must comply with the 1997 Site Plan.

More specifically, in the Declaration "Zoning Conditions" is defined as a collection of the conditions found in the 1997 Site Plan, which is referred to as "Z-96-69 and Z-96-70":

> *"Zoning Conditions"* shall mean, collectively, *all Project Specific Conditions*, General Conditions and Zoning Conditions set forth in Z-96-69 and Z-96-70, or either of them, *together with such other or further conditions* as may hereafter be imposed by the City of Atlanta or the Planning

Department upon development of the Phipps Land, or any portion thereof, and "Zoning Condition" shall mean any one of them.

(Emphasis supplied.) One of these conditions is a "Project Specific Condition," found in Z-96-69, which refers back to CPI's portion of the 1997 Site Plan:

*SECTION 1. PROJECT SPECIFIC CONDITIONS:*

1. A site plan, dated February 3, 1997 marked received by Bureau of Planning February 5, 1997, to be approved by the Bureau of Planning, which depicts a maximum of 2,100,000 square feet (1,600,000 retail and 500,000 office) of development and illustrates areas to accommodate pedestrians in a manner that connects this development with neighboring properties and public sidewalks, bicycle racks, shuttle van stopping locations, parking for carpools and vanpools.

This condition is the basis of Kusmiersky's claim that CPI is limited to developing "a maximum of 2,100,00 square feet (1,600,000 retail and 500,000 office)," and that therefore additional residential buildings are not allowed. A statement found in the recitals to the Declaration can be seen as supporting the conclusion that the Zoning Conditions found in the 1997 Site Plan were intended to affect future development:

It is contemplated that the several Tracts may hereafter be separately owned, and where not already developed and improved, separately developed and improved. . . . [S]uch separation of ownership may impact upon certain requirements of the Zoning Ordinance relating to [PD-MU] properties, as well as the application of certain Zoning Conditions imposed upon future development of the Phipps Land pursuant to Z-96-69 and Z-96-70.

As can be seen, Paragraph 3.1 has two possible meanings: CPI may amend the 1997 Site Plan or CPI may not amend it. Paragraph 3.1 is therefore ambiguous. See, e.g., *Daniel v. Douglas County*, 261 Ga. 103, 104 (401 SE2d 508) (1991).

Kusmiersky argues, and the trial court agreed, that the paragraph is not ambiguous based on their reading of the phrase "together with such other or further conditions as may hereafter be imposed by the City of Atlanta or the Planning Department," which is found in the definition of "Zoning Conditions." The trial court held that the

"together with" language "freezes" the requirement that future development must comply with the 1997 Site Plan and that "together with such other or further conditions" means that any future amendments to the site plan for Tract H may only add to this requirement. CPI argues that "other and further conditions" can mean both new conditions and changes to current conditions; for this reason, the "Project Specific Condition" is subject to amendment at any time.

We disagree with both parties and the trial court on this point because the phrase refers to other and further conditions "imposed by the City of Atlanta or the Planning Department." The phrase does not appear to refer to amendments sought by the parties themselves, which could hardly be called an "imposition" upon them. The requirement that "any future development" be undertaken only in accordance with the "Zoning Conditions" could be read to mean that future development must comply with the 1997 Site Plan and any other government conditions subsequently imposed. Thus the phrase beginning with "together with" does not resolve the ambiguity.

Kusmiersky also argues that the phrase "which depicts a maximum of 2,100,000 square feet (1,600,000 retail and 500,000 office)" found in the Project Specific Condition restricts CPI's usage of the property independent of the 1997 Site Plan.[10] We disagree. The condition specifies one and only one site plan — one "dated February 3, 1997 marked received by Bureau of Planning February 5, 1997." Thus, the condition includes each and every aspect of that site plan, not just the summary mentioned in the quoted clause. Moreover, a clause beginning with "which" is usually nonrestrictive, that is, it contains incidental detail, as opposed to a restrictive clause, which contains information that is "essential to the grammatical and logical completeness of [the] sentence." Garner, A Dictionary of Modern American Usage, 1998, p. 648.

b. We are left with the ambiguity found in Paragraph 3.1, which appears to allow for future development in accordance with amended site plans while at the same time restricting future development to the 1997 Site Plan. We turn, therefore, to the applicable rules of construction, one of which is that we "give the greatest effect possible to all provisions rather than . . . leave a part of the contract unreasonable or of no effect." (Citation omitted.) *Quintanilla v. Rathur*, 227 Ga. App. 788, 790 (1) (490 SE2d 471) (1997). See also OCGA § 13-2-2 (4). Another is that restrictions on the use of land shall be clearly established and strictly construed against the party seeking to enforce the restriction. *Douglas v. Wages*, 271 Ga. 616, 617 (523 SE2d

---

[10] The court held that the "Project Specific Condition" limits CPI to 1,600,000 retail and 500,000 office square feet — hence no residential or hotel space.

330) (1999); *Roth v. Connor*, 235 Ga. App. 866, 867 (510 SE2d 550) (1999).[11] Finally, "parol evidence as to the surrounding circumstances is admissible to explain ambiguities and to aid in the construction of contracts, (OCGA § 24-6-3 and § 24-6-4)," although it is not admissible to contradict or change the terms of a written instrument. (Punctuation omitted.) *Ambase Intl. Corp. v. Bank South*, 196 Ga. App. 336, 338 (1) (395 SE2d 904) (1990), citing *Kellos v. Parker-Sharpe, Inc.*, 245 Ga. 130, 132 (1) (263 SE2d 138) (1980). See also OCGA § 13-2-2 (1).

Reading the entire Declaration with these rules in mind, we conclude that Paragraph 3.1 requires future development to conform with the 1997 Site Plan unless the site plan is amended, which amendment CPI is authorized to seek.

Paragraph 3.4 allows each owner to seek and obtain amendments to the site plan for their parcel. There is no way to do that without amending the 1997 Site Plan because there is no other plan. Although the 1997 Site Plan was comprised of two parts — one site plan applicable to each owner's parcel — CPI was authorized to amend its part. Thus, if Paragraph 3.1 restricts CPI to the 1997 Site Plan, Paragraph 3.4 is rendered meaningless — CPI would not be allowed to modify any portion of the only site plan. Yet the entire document makes clear that enabling future development was one of its primary purposes. In addition to the plain wording of Paragraph 3.4 and parts of Paragraph 3.1, other provisions of the Declaration directly imply that future development and future rezoning was contemplated. For instance,

> No Owner shall undertake any future development or seek *any future rezoning* of any portion of the Phipps Land which would have the effect of placing any other Tract in violation of applicable provisions of the Zoning Ordinance.

(Emphasis supplied.) Also, although Paragraph 3.4 references Paragraph 3.1, it only says "*In addition to the rights* provided for in [Paragraph] 3.1," (emphasis supplied), which suggests that it is not subject to any limitations in Paragraph 3.1.

This interpretation also gives effect to Paragraph 3.1 regarding the 1997 Site Plan. That condition can be read to mean that, at the time the parties entered into the Declaration, CPI was required to comply with the 1997 Site Plan because it was the then existing

---

[11] The Declaration provides that it may not be "construed or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision."

"project specific" approved plan. A different project with a different site plan would have its own conditions. This interpretation is also consistent with the clause found in Paragraph 3.1 that acknowledges that Kusmiersky intended "to seek modification of the Zoning Conditions and Comprehensive Development Plan as required to permit development of the condominium tower on Residential Tract 2." Kusmiersky contends that if the Declaration allows any party to amend the site plan, then this clause would not be necessary. But this clause allows Kusmiersky to seek modification of the Comprehensive Development Plan as well, something entirely different from the site plan.

Moreover, when we construe Paragraph 3.1 strictly against Kusmiersky's claimed use restriction, it is impossible to conclude that a use limitation on CPI's parcel has been clearly established. The purported limitation is stated in a site plan that is listed as a project-specific condition of a zoning amendment that, in turn, is referenced in a definition of one of the terms of Paragraph 3.1, which itself refers to the parties "rezoning" their property and engaging in "future development" in accordance with "an Approved Site Plan." And the purported limitation is directly inconsistent with the parties' right to amend the site plan affecting their own parcel.

Finally, as stated above, we are authorized to consider circumstances surrounding the execution of the Declaration when construing the agreement, including contemporaneous writings. See OCGA § 24-6-3 (a). We find it consistent with our interpretation of the Declaration that although Kusmiersky's purchase and sale agreement for the residential tract expressly restricted his use to residential, neither that agreement nor CPI's purchase and sale agreement included the restriction on CPI's future use that Kusmiersky seeks here.

For the reasons stated herein, we conclude the trial court erred by enjoining CPI from seeking to amend the site plan applicable to its portion of the Phipps Land, and we therefore reverse the grant of summary judgment in favor of Kusmiersky. We also reverse the denial of CPI's motion for summary judgment on the issue addressed herein and remand with instruction to enter partial summary judgment in favor of CPI consistent with this opinion.

*Judgment reversed and case remanded with direction. Andrews, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 29, 2007 — ■

*Alston & Bird, Rebecca M. Lamberth, Colin K. Kelly*, for appellant.

*McKenna, Long & Aldridge, Barry J. Armstrong, Samantha M. Rein*, for appellee.

*Weissman, Nowack, Curry & Wilco, Jeffrey H. Schneider, Brinson, Askew, Berry, Seigler & Davis, Norman S. Fletcher*, amici curiae.